## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| J M SMITH CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-03176-SRB |
| | ) | |
| THE BANK OF MISSOURI, | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LYNN MORRIS, TIM STALLION, | ) | |
| ROBINSON & CO., LLP, and ABACUS CPAs, | ) | |
| LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## ORDER

Before the Court is Defendant The Bank of Missouri's ("BOM") Motion for Summary

Judgment on Each Count of Plaintiff J M Smith Corporation d/b/a Smith Drug's ("Smith Drug")

Third Amended Complaint. (Doc. #260.) For the reasons set forth below, the motion is

DENIED.

## I. FACTUAL BACKGROUND

For the purpose of resolving the pending motion, the following facts are uncontroverted

or deemed uncontroverted by the Court.[1] Additional facts relevant to the parties' arguments are

set forth in Section III.

---

[1] The Court notes that the applicable standard requires the facts to be viewed in the light most favorable to the non-moving party, Smith Drug. BOM generally presents the facts in the light most favorable to BOM, and also omits many material facts. In addition, several disputed and material facts turn on the credibility of witnesses. At this stage of the proceedings, the Court need not identify all of the facts of this case or all of the factual disputes because it is ultimately the jury's role to find the facts. The purpose of this Order is to identify some genuine issues of material fact and explain why those facts preclude judgment as a matter of law.

Smith Drug is a South Carolina corporation and its principle place of business is in South Carolina.  Smith Drug is a wholesale distributor of pharmaceuticals.  BOM is a Missouri community bank, and the branch at issue is located in Ozark, Missouri.  Non-party Family Pharmacy was an independent retail pharmaceutical chain that had operated throughout southwest Missouri.[2]  At all relevant times, Third-Party Defendant Lynn Morris ("Morris") owned the shares and/or the member interests of Family Pharmacy.  At all relevant times, Third-Party Defendant Tim Stallion ("Stallion") served as Family Pharmacy's accountant and/or Chief Financial Officer.

In July 2014, BOM issued two loans to Family Pharmacy in the total amount of $362,000.  In February 2015, BOM made two additional loans to Family Pharmacy in the amounts of $5,253,000 and $6,205,000.  Through June 1, 2017, BOM also provided Family Pharmacy two $2,000,000 revolving lines of credit ("RLOCs").

The loans from BOM to Family Pharmacy had various conditions and covenants.  One covenant required that an outside accountant review Family Pharmacy's annual financial statements beginning January 1, 2015.  Another condition required that Family Pharmacy provide BOM monthly borrowing base certificates.  The base certificates reported accounts receivable ("A/R") that included receivables which were not considered past due or uncollectible.  Family Pharmacy provided the base certificates to BOM, though they were often late in doing so.  The base certificates were certified as accurate by Stallion.

At all relevant times, Devin Bobbett ("Bobbett") served as BOM's Senior Vice President (Commercial Lending).  Family Pharmacy was one of Bobbett's largest customers in 2015 through 2017.  In June 2016, Stallion informed Bobbett that Family Pharmacy could not generate

---

[2] For purposes of this Order, Family Pharmacy collectively refers to Family Pharmacy, Inc., Family Pharmacy, LLC, and any other related entities.

an accounts receivable aging and that Family Pharmacy "hired an accounting clerk . . . to help us manage A/R." (Doc. #292-7, p. 2.)[3] In July 2016, BOM employee Lori Mouser ("Mouser") told Bobbett that "I think the level of bad debt could be underreported as it may be unknown just how stale some receivables have become." (Doc. #292-6, p. 3.) In October 2016, Stallion again advised Bobbett that Family Pharmacy was "unable (unfortunately) to provide an A/R aging of our 3rd Party Insurance Receivables. We are currently working actively . . . to reconcile our 3rd Party A/R and secure an accurate aging. . . . We are trying to identify claims written off . . . that are still collectible." (Doc. #292-22, p. 2.)

In 2016, Family Pharmacy began looking at options to replace its existing wholesale drug provider, Cardinal Health ("Cardinal"). In December 2016, Family Pharmacy management visited Smith Drug's headquarters in South Carolina to discuss a potential business relationship. As early as January 2017, some Smith Drug employees expressed concerns regarding a deal with Family Pharmacy. On January 5, 2017, Smith Drug's Divisional Vice President of Sales, DeWayne Benson, stated: "Not sure we want to move forward yet . . . David is telling me they owe Cardinal around $10,000,000." (Doc. #261-30, p. 1.)

On January 14, 2017, Smith Drug decided to ask Family Pharmacy to provide it with three years of financial statements. Beginning in February 2017, Stallion emailed members of Smith Drug's management and described why Family Pharmacy wanted to replace Cardinal, the negative financial performance Family Pharmacy began to experience in 2015, and its continued financial issues in 2016.

On February 6, 2017, Stallion provided Family Pharmacy's financial statements for 2014 to Smith Drug, a review of Family Pharmacy's financial statements for 2015 which was

---

[3] All page numbers refer to the pagination automatically generated by CM/ECF.

completed by Third-Party Defendant Robinson & Co., L.L.P. ("Robinson"), and Family Pharmacy's interim financial statements through August 2016.[4] Based on the information provided by Stallion in February 2016, Smith Drug understood that Family Pharmacy's "[l]iabilities are substantial," that it was "[p]ast due with current wholesaler," and that it "was not in compliance with covenants for line of credit with bank." (Doc. #261-32, p. 1.)

On April 14, 2017, Bobbett had a meeting with Morris and Stallion. At the meeting, Morris and Stallion provided Bobbett a copy of Family Pharmacy's 2016 preliminary financial statements. Bobbett was surprised at the poor results in the 2016 statements and was concerned about Family Pharmacy's financial condition. Morris and Stallion explained that the losses were primarily caused by the cost of goods sold by Cardinal, and that Family Pharmacy was going to seek proposals from other suppliers. Bobbett was not concerned about whether BOM should continue to loan money to Family Pharmacy because he thought Family Pharmacy was "taking steps to turn things around." (Doc. #292-1, p. 20.)

On April 20, 2017, Smith Drug's then-Vice President of Finance, Kyle Waltz ("Waltz") wrote the following to Smith Drug's management:

> We have some challenges to think through next week as we evaluate the credit risk of these stores: 1) The group has $27M in debt in the latest financial statements 2) They operated at a deficit in calendar year 2016 . . . 3) They are not in compliance with their wholesaler (Cardinal) 4) They are not in compliance with their debt covenants . . . Takeaways 1) This is high risk for sure. It's definitely not for the faint of heart 2) There are two outcomes in a simple look a. The customer pays us on time for 4-5 years and we get past a break-even point. We deliver value on our shareholder's investment b. The customer runs aground in the 1-3 year period, and we have to harvest what is left of our investment.

---

[4] As stated above, one term of the loans from BOM to Family Pharmacy required that an outside accountant review Family Pharmacy's annual financial statements. Family Pharmacy hired Robinson to review its 2015 year-end financial statements. BOM has asserted third-party claims against Robinson based on that review. Additional facts and issues relating to Robinson are addressed in the Court's separate order resolving its motion for summary judgment.

(Doc. #261-34, p. 1.)

On April 28, 2017, Smith Drug's Credit Manager Tony Thompson ("Thompson") sent an email to Stallion.  Thompson asked "Do you have anything, in writing, that can address the bank's comfort level as to the lending and the covenants?"  (Doc. #261-43, p. 1.)  Later that day, Stallion responded:  "If our relationship progresses, we will put you in contact with our bank to talk with them directly.  Our [compliance] Review will likely require a written waiver of any covenant we do not meet, but the Review has not been completed for 2016 as yet.  We have a very good and transparent relationship with our bank. We have already met with them and provided 2016 year-end financials[.]"  (Doc. #261-43, p. 1.)

On May 3, 2017, Stallion notified BOM for the first time that Family Pharmacy had been talking with Smith Drug to "improve our pricing from Cardinal . . . or to replace Cardinal entirely."  (Doc. #261-45, p. 1.)  Stallion requested that  Bobbett  and BOM's Branch  Manager Jana  Humble ("Humble")  meet  with  Thompson  and Stallion  over  lunch for an "open conversation" about Family Pharmacy's "financial aspects."  (Doc. #261-45, p. 1.)  Stallion told Bobbett and Humble that he "believe[d] strongly that this [meeting] is extremely important to" Family Pharmacy.  (Doc. #261-45, p. 1.)  Bobbett and Humble agreed to the meeting, which took place on May 9, 2017 (the "May 9 meeting").

Prior to and going into the May 9 meeting, Bobbett was aware of several facts. Specifically, Bobbett testified:  that he was not obligated to attend the meeting but did so as part of BOM's business relationship with Family Pharmacy; that he knew Smith Drug was evaluating whether to enter into a supplier relationship with Family Pharmacy; that he knew it was "extremely important" for Family Pharmacy to find a new drug supplier and reduce its cost of goods sold; that he knew the RLOCs that Family Pharmacy had with BOM were expiring on

June 1, 2017; that Family Pharmacy's ability to continue as a going concern would be hindered if BOM decided not to renew the RLOCs; that he had not yet completed his review of Family Pharmacy's compliance with the loan agreements based on the 2016 financial statements; that Family Pharmacy had never been able to provide BOM with an accounts receivable aging report; that Family Pharmacy's failure to timely provide monthly base certificates was a violation of their loan agreements and loan covenants with BOM; and that at the meeting he had implied authorization from Stallion to "speak freely about Family's financial condition, operations, you know, whatever." (Doc. #292-1, pp. 6, 9.)

Thompson travelled from South Carolina to Ozark, Missouri for the May 9 meeting. Thompson, Stallion, Bobbett, and Humble met at a local restaurant. There is conflicting testimony as to what was said, or not said, during the meeting. Thompson testified that:

> **Mr. Bobbett** gave a brief history of the banking relationship that Family Pharmacy had with Bank of Missouri . . . [a]fter we got our meal, I asked Mr. Bobbett about the loan covenants, specifically the debt to equity covenants, which was out of compliance. And we were -- we knew that they had had a waiver the prior year. And I was asking him how they were going to handle that this year, the current -- under the current year. And he **responded that, yes, they [1] had completed their compliance review, the compliance review had been completed. [2] That Family Pharmacy was in compliance with the current ratio . . . [3] They weren't in compliance with the debt to equity ratio. And he expressed that because Family Pharmacy was in compliance with the current ratio and the other covenants as well as the other financial information that had been presented to them, that the bank would be – since the compliance review had been completed, [4] the bank would be renewing the lines of credit**.

(Doc. #261-4, p. 14) (emphasis and bracketed numbers supplied).[5]

---

[5] The "current ratio" refers to a loan covenant which required that Family Pharmacy's "working capital should be maintained at not less than 1:1 including Current Portion of Long Term Debt." (Doc. #179, p. 7.) Smith Drug contends that Family Pharmacy could not show compliance with this ratio because it did not know what portion of its accounts receivable could be collected.

6

Bobbett has a different recollection of the May 9 meeting. Bobbett testified that as of May 9, 2017, BOM had not yet completed its compliance review for Family Pharmacy. Bobbett testified he did not tell Thompson that BOM had completed its 2016 compliance review, but if he had, the representation would have been false. Bobbett recalled discussing that BOM had waived Family Pharmacy's noncompliance with the debt to equity covenant, but does not recall whether he specified that the waiver was based on 2015 financial statements as opposed to 2016 financial statements. Bobbett testified he did not tell Thompson that BOM would be renewing Family Pharmacy's RLOCs, but if he had, the representation would have been false. Near the end of the meeting, Bobbett told Thompson that "based on our relationship and history with Family . . . I was confident that we would continue to work with them." (Doc. #292-1, p. 14.)

At the May 9 meeting, Bobbett did not inform Thompson that Family Pharmacy had been unable to provide BOM documentation regarding whether its accounts receivable was collectible, which could have affected Family Pharmacy's compliance with the current debt ratio. Bobbett did not inform Thompson that Family Pharmacy failed to timely provide BOM its base borrowing certificates, which violated the loan covenants.

On May 10, 2017, Thompson sent an email to employees of Smith Drug regarding the May 9 meeting. In relevant part, Thompson reported that:

> I also met with the Senior VP and VP of the Bank of Missouri which is the primary lender for Family Pharmacy. The bank just completed a compliance review and nothing was found to be out of bounds with any of the credit facilities for Family Pharmacy. They do comply with most of the lending covenants:
>
> • Current ratio of at least 1:1
> . . .
> • . . . The only covenant that is outside compliance is debt to equity (10.5 to l), but the bank has . . . enough confidence in the management of Family that the other covenants that are in compliance offset the one that is not.

Bobbett testified he did not complete his compliance review of the Family Pharmacy 2016 year-end financial statements until May 12, 2017. In a letter dated May 12, 2017, Bobbett informed Family Pharmacy that it was not in compliance with "the debt/worth and debt coverage [loan] covenants." (Doc. #292-36, p. 2.) Bobbett stated that "[i]mmediate attention to bring these covenants into compliance is required." (Doc. #292-36, p. 2.) The letter does not state or otherwise indicate that BOM would be waiving the debt to equity covenant. On May 23, 2017, Bobbett informed Family Pharmacy that "the erosion of financial position and liquidity has resulted in a downgrade of your loan credit classification." (Doc. #261-50, p. 1.)

The ROLCs provided by BOM to Family Pharmacy had a maturity date of June 1, 2017. On June 8, 2017, the BOM loan committee agreed to extend the RLOCs for 90 days to allow Family Pharmacy to continue its efforts to find a new supplier and to provide additional financial information to BOM. However, BOM reduced the available credit on each RLOC from $2 million to $1 million. BOM did not notify or otherwise inform Smith Drug about the credit downgrade or about the changes to the RLOCs.

Throughout June 2017, members of Smith Drug's management opined that a deal with Family Pharmacy was "a very risky investment proposition," that "there is not enough profit to rationalize the risk," and that it had "the potential to go bad quickly." (Doc. #261-60, p. 1; Doc. #261-61, p. 1; Doc. #261-64, p. 1.) Nonetheless, on or about June 30, 2017, Smith Drug decided to enter into a business relationship with Family Pharmacy. Highly summarized, Smith Drug extended credit to Family Pharmacy and Family Pharmacy purchased drugs from Smith Drug.

The Smith Drug/Family Pharmacy business relationship was not a success. By February 2018, Family Pharmacy owed Smith Drug nearly $17,000,000. On April 30, 2018,

Family Pharmacy filed for bankruptcy. During the bankruptcy proceeding through a competitive bidding process supervised by U.S. Bankruptcy Judge Cynthia Norton, Smith Drug obtained all 23 of the pharmacies previously operated by Family Pharmacy.

On May 16, 2019, Smith Drug filed this lawsuit against BOM. Smith Drug alleges in part that BOM made false representations and omissions during the May 9 meeting, and that Smith Drug relied on such representations and omissions when deciding to extend credit to Family Pharmacy. Smith Drug also alleges that BOM was required, but failed, to disclose certain facts about Family Pharmacy following the May 9 meeting. Smith Drug's Third Amended Complaint asserts the following claims against BOM: Count I—Fraud; Count II—Negligent Misrepresentation; Count III—Fraud and Conspiracy to Commit Fraud; and Count IV—Aiding and Abetting Fraud. Smith Drug alleges that it sustained $16.3 million in damages "as a direct result of BOM's tortious conduct." (Doc. #118, p. 2.)

BOM now moves for summary judgment on each claim under Federal Rule of Civil Procedure 56. BOM argues that (1) all claims asserted by Smith Drug are barred by the statute of frauds; (2) the fraud and negligent misrepresentation claims fail because: (a) Smith Drug had no right to rely on any representation made by BOM, and (b) Smith Drug's damages were caused by its own business decisions, not by BOM; and (3) summary judgment is warranted on Smith Drug's conspiracy and aiding and abetting claims because there is no evidence that BOM and Family Pharmacy had a meeting of the minds or that BOM provided assistance in support of a conspiracy. Smith Drug opposes the motion, and the parties' arguments are addressed below.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  The moving party has the burden of identifying "the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up).  If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial."  *Id.* (quotation marks omitted).  If there is a genuine dispute as to certain facts, those facts "must be viewed in the light most favorable to the nonmoving party." *Id.*  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quotation marks omitted).

## III.  DISCUSSION

### A.  Statute of Frauds

BOM argues it is entitled to summary judgment under Missouri's Statute of Frauds.[6] BOM contends that the statute of frauds precludes any claim based upon oral representations of another person's creditworthiness.  In response, Smith Drug argues there is an exception to the statute of frauds when the defendant was authorized to speak about the other person's creditworthiness.  As explained below, the Court agrees with Smith Drug and finds the exception is applicable in this case.

Missouri's Statute of Frauds provides that:

> ***No action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the*** character, conduct, ***credit***, ability, ***trade or dealings of any other person, unless such representation or assurance be made in writin***g, and subscribed by the party to be charged thereby, or by some person thereunto by him lawfully authorized.

---

[6] The parties agree, and the Court finds, that all substantive claims asserted by BOM are governed by Missouri law.

Mo. Rev. Stat. § 432.040 (emphasis supplied). This statute "generally gives total immunity to irresponsible speech in oral responses to credit inquiries." *Tenna Mfg. Co., Inc. v. Columbia Union Nat'l Bank & Trust Co.*, 484 F. Supp. 1214, 1219 (W.D. Mo. 1980).

However, there are exceptions to the statute of frauds. One exception was recognized in *Jeck v. O'Meara*, 122 S.W.2d 897 (Mo. 1938). In *Jeck*, a zone manager for the Chevrolet Motor Company told a potential investor in a dealership that the dealership was "solvent and in a safe, sound financial condition." *Jeck*, 122 S.W.2d at 899, 901. These statements were false. After losing most of his investment, the investor sued the manager for fraud. The manager argued the claim was barred by the statute of frauds "because the representation as to the solvency of the [dealership] was not in writing." *Id.* at 902.

*Jeck* rejected the manager's argument. *Jeck* explained that "prior to plaintiff's coming into the picture, [the manager] had frequently conferred with [the dealership] about finding someone who would put additional money into the [dealership]." *Id.* The manager had also "been active in trying to find someone who would invest in this company." *Id.* at 902-03. Under these circumstances, *Jeck* found the statute of frauds did not apply because the manager "should be considered as the agent of [the dealership]," and because he "spoke . . . as though he was one of the owners of stock of [the dealership], *or was authorized to speak for the owners of such stock and for the company*." *Id.* at 903 (emphasis supplied).[7]

In this case, Smith Drug has presented sufficient evidence to bring its claims within the *Jeck* exception. Thompson asked Stallion for "anything, in writing, that can address [BOM's]

---

[7] The Court previously recognized the *Jeck* exception in an Order denying BOM's motion to dismiss. (Doc. #39, pp. 4-5.) The Order also recognized a "second exception . . . when a 'trustee ex maleficio' acts to the extent of any unjust enrichment." (*Id.* at p. 4). Under this exception, Smith Drug may seek unjust enrichment damages on its misrepresentation claims. *See Tenna Mfg.*, 484 F. Supp. at 1220; *Beall v. Farmers' Exchange Bank of Gallatin*, 76 S.W.2d 1098, 1100 (Mo. 1934) (recognizing that the trustee ex maleficio exception applies when a party seeks "to impress the funds of the bank with a trust for the amount obtained and held . . . through the fraud").

11

comfort level as to the lending and the covenants[.]" (Doc. #261-43, p. 1.) Stallion responded that he would put Smith Drug "in contact with our bank to talk with them directly." (Doc. #261-43, p. 1.) Stallion then asked—and Bobbett and Humble agreed—to meet with Thompson. Stallion told Bobbett and Humble that the meeting was "extremely important" and would involve an "open discussion" about Family Pharmacy's "financial aspects." (Doc. #261-45, p. 1.)

At the beginning of the May 9 meeting, Stallion said that BOM was "free to discuss, you know, any questions that [Thompson] would ask." (Doc. #261-4, p. 13.) Bobbett testified that he had "implied authorization to speak freely about Family's financial condition, operations, you know, whatever." (Doc. #292-1, p. 6.) Bobbett also knew that Family Pharmacy was trying to find a new supplier and that Smith Drug was deciding whether to do business with Family Pharmacy. These facts support a finding that Bobbett "was authorized to speak for" Family Pharmacy at the May 9 meeting. *Jeck*, 122 S.W.2d at 902-03. Consequently, BOM is not entitled to summary judgment under the statute of frauds.

BOM argues that *Jeck* did not create an exception to the statute of frauds, that *Jeck* is limited to its own facts, and that other cases support the entry of summary judgment. (Doc. #261, pp. 44-46; Doc. #304, pp. 69-75.) For example, BOM relies upon *Montello Oil Corp. v. Apex Oil Co.*, 571 F. Supp. 389 (E.D. Mo. 1983), but that case is distinguishable. In *Montello*, the plaintiff called the defendant who was listed as a credit reference on a third-party's credit application. *Id.* at 390. Based on allegedly false information provided by the defendant, the plaintiff extended credit to the third-party who later defaulted. *Id.* *Montello* held that the plaintiff's claims were barred by the statute of frauds, and explained that the statute is intended to protect "citizens from being drawn improvidently into third party conflicts in situations where

12

the nature of the assurance cannot be clearly established by documentary evidence, and to limit the possibility of perjury." *Id.* at 390-91.

In contrast to *Jeck* and this case, *Montello* did not involve a meeting between the plaintiff, the speaker, and the party who allegedly authorized the speaker to speak on its behalf. *Montello* did not cite *Jeck*, and did not address any allegation that the defendant was authorized to speak on behalf of the third-party. Unlike *Montello*, Smith Drug has presented evidence negating BOM's argument that it is being "drawn improvidently into third party conflicts." *Id.* at 390-91.

BOM also relies on *Knight v. Rawlings*, 104 S.W. 38, 44 (Mo. 1907) for the proposition that "Missouri does not recognize an exception to the Statute of Frauds for persons 'authorized to speak' when making a representation concerning any other person." (Doc. #261, p. 45, p. 46 n.10.) According to BOM, *Knight* held that Missouri requires a writing even in cases of fraud or conspiracy where one may appear to have authority to speak on another's behalf. But even assuming that BOM accurately summarizes *Knight*, *Jeck* was decided 31 years later and has not been overruled. Moreover, *Jeck* cited *Knight* and did not identify any conflict between the cases. Under these circumstances, the Court follows *Jeck* and finds that Smith Drug's claims are not barred by the statute of frauds. *See Bass v. General Motors Corp.*, 150 F.3d 842, 847 (8th Cir. 1998) ("In resolving any substantive issues of state law, we are bound by the decisions of the Missouri Supreme Court."); *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992) ("We are convinced that *Ernst*, the most recent Missouri case, represents the best evidence of Missouri law.").[8]

_____

[8] BOM's reply brief argues that *Boyd v. Farmers' Bank*, 14 S.W.2d 6 (Mo. App. W.D. 1928) also supports application of the statute of frauds. But *Boyd* is a court of appeals decision and was decided prior to the Missouri Supreme Court's decision in *Jeck*. The Court does not find *Boyd* to be binding or persuasive authority under the facts of this case.

13

**B. Count I: Fraud**

Count I of the Third Amended Complaint asserts a claim against BOM for fraudulent

representations and omissions. The elements of a fraudulent misrepresentation claim are:

> (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge
> of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted
> on by the person in the manner reasonably contemplated; (6) the hearer's ignorance
> of the falsity of the representation; (7) the hearer's reliance on the representation
> being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent
> and proximately caused injury.

*Freitas v. Wells Fargo Home Mortg., Inc*., 703 F.3d 436, 438-39 (8th Cir. 2013) (citing

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131–32 (Mo. banc 2010)).

The elements of a fraudulent omission claim are similar, except "a party's silence in the

face of a legal duty to speak replaces the first element: the existence of a representation." *Hess v.*

*Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). Whether there is a

duty to speak "must be determined on the facts of the particular case." *Id.* A duty to speak may

arise "from a relation of trust, from confidence, inequality of condition, or superior knowledge

which is not within the fair and reasonable reach of the other party." *VanBooven v. Smull*, 938

S.W.2d 324, 328 (Mo. App. W.D. 1997).

### 1. Whether BOM Owed a Duty to Smith Drug.

BOM argues that even assuming Bobbett made misrepresentations at the May 9 meeting,

"Smith Drug had *no* right to rely on them because there was *no* relationship—contractual,

fiduciary, informal or otherwise—between Smith Drug and BOM, and thus, BOM owed no duty

to Smith Drug." (Doc. #261, pp. 46-47) (emphasis in original); (Doc. #304, p. 75.)[9] As

---

[9] There are genuine issues of material fact regarding what Bobbett said—or did not say—at the May 9 meeting. If the jury finds Thompson's testimony to be credible, it could find that Bobbett made certain misrepresentations, including that BOM had completed its compliance review, and that BOM was renewing Family Pharmacy's RLOCs.

explained below, the Court finds that summary judgment is not warranted based upon the lack of a duty.

First, Smith Drug asserts a fraud claim based on affirmative misrepresentations allegedly made by BOM at the May 9 meeting. An affirmative misrepresentation claim does not require evidence of a duty. *Freitas*, 703 F.3d at 438-39; *Renaissance Leasing, LLC*, 322 S.W.3d at 131–32. To the extent BOM argues otherwise, that argument is rejected.

Second, Smith Drug argues that BOM had a duty to disclose certain information during the May 9 meeting. Such information included Family Pharmacy's "failure to provide [BOM] documentation that would verify collectability of its receivables in order to make its disclosure that Family complied with the current ratio covenant not misleading." (Doc. #292, p. 118.) Smith Drug also argues that BOM had a duty to inform Smith Drug of its subsequent decision to only extend Family Pharmacy's RLOCs for 90 days and at reduced limits.

BOM argues it had no duty to disclose this information because it "had no fiduciary, contractual, informal or long-standing business relationship with Smith Drug." (Doc. #261, p. 50.)[10] However, as stated above, the duty to speak depends upon "the facts of the particular case." *Hess*, 220 S.W.3d at 765. "[A] duty may be assumed or undertaken, and when so assumed, the defendant must exercise reasonable care." *Knop v. Bi-State Develop. Agency*, 988 S.W.2d 586, 591 (Mo. App. E.D. 1999). Missouri courts have also recognized that "[w]hen a party makes a partial disclosure, the party then has a duty to tell the whole truth." *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 62 (Mo. App. E.D. 1999).

---

[10] BOM also argues it had a "strict confidentiality policy" which prevented it from disclosing information without Family Pharmacy's consent. (Doc. #261, p. 8.) As discussed throughout, the record supports a finding that Family Pharmacy provided such consent and/or that BOM had a duty to complete or correct certain disclosures that it made.

In this case, the record supports a finding that BOM had a duty to disclose information to Smith Drug at the May 9 meeting. Bobbett decided to voluntarily attend the meeting, knew the purpose of the meeting was to discuss Family Pharmacy's financial aspects, knew that the meeting was part of Smith Drug's due diligence into Family Pharmacy, and knew that Family Pharmacy wanted to make a deal with Smith Drug. Bobbett also knew that he could speak freely about Family Pharmacy's financial condition. These facts show that Bobbett assumed a duty to provide Smith Drug with material information known to him. *See Knop*, 988 S.W.2d at 591; *VanBooven*, 938 S.W.2d at 328 ("Silence or concealment of facts can amount to actionable fraud if it relates to a material matter known to the party sought to be held accountable for fraud.")

In addition, the record shows that Bobbett made partial disclosures regarding Family Pharmacy's financial condition and loan status at the May 9 meeting. Once Bobbett made some disclosures, BOM had a duty to correct or complete those disclosures after the May 9 meeting, including its decision to reduce Family Pharmacy's RLOCs. *See Kesselring v. St. Louis Grp., Inc.*, 74 S.W.3d 809, 814 (Mo. App. E.D. 2002) ("If Brokers gave Buyers the impression that their files contained all relevant business documents, they had a duty to disclose all relevant documents.").

For these reasons, the Court rejects BOM's argument that it did not owe a duty to Smith Drug.

### 2. Whether Smith Drug Had a Right to Rely on BOM's Representations.

BOM argues that Smith Drug had no right to rely on any of its representations. In support of this argument, BOM argues that it had no relationship with Smith Drug, that Smith Drug had access to Family Pharmacy's financial information, and that Smith Drug performed its

own due diligence before entering into the business deal with Family Pharmacy. As explained below, the record shows that a jury should decide this issue.

"The right to rely on a representation is ordinarily a question of fact for the jury." *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 690 (Mo. App. E.D. 1994). If "a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby." *Id.* However, simply because a plaintiff "conducts an independent investigation does not preclude his/her claim of reliance . . . if the parties do not stand on equal footing and the facts are peculiarly within the knowledge of the party making the representation and are difficult for the representee to ascertain." *Id.* at 691 (citations and quotation marks omitted).

In this case, BOM has presented facts that suggest Smith Drug did not rely—and did not have a right to rely—on any alleged misrepresentations and/or omissions. Those facts include Smith Drug's status as a sophisticated business entity, that Smith Drug conducted its own investigation into Family Pharmacy's financial situation, and that Smith Drug had serious concerns about Family Pharmacy's financial well-being.

However, Smith Drug has presented evidence that it had a right—and did—rely on information provided by BOM. Among other things, Smith Drug requested BOM provide information regarding Family Pharmacy's financial condition. Thompson travelled from South Carolina to personally meet with BOM. The representations allegedly made by Bobbett at the May 9 meeting—including that BOM had completed its compliance review and that BOM had decided to renew Family Pharmacy's RLOCs—were arguably matters solely within the knowledge of BOM. Based upon the evidence presented by both parties, a jury should decide

17

whether Smith Drug had a right to rely on BOM's representations and whether that reliance was reasonable. *Colgan*, 879 S.W.2d at 690.

### 3. Whether Smith Drug's Alleged Damages Were Caused by BOM.

BOM argues that Smith Drug cannot show that any of BOM's acts or omissions caused damages. BOM contends that:

> Smith Drug onboarded a financially flailing company after months and months of negotiations, and did so for the strategic business reason of attempting to gain business in a 'desperately needed' territory. Smith Drug did so despite the fact that everyone in management recognized that the deal with Family Pharmacy could 'go bad quickly' . . . Smith Drug decided to roll the dice, even though it never had any further discussions with BOM after the 90-minute May 9 lunch meeting. Smith Drug's own reckless business decision is what caused its damages, not BOM.

(Doc. #261, p. 51) (citations omitted).

"Causation is generally an issue left to the trier of fact." *Peterson v. Summit Fitness, Inc.*, 920 S.W.2d 928, 936 (Mo. App. W.D. 1996). Although BOM's causation argument has support in the record, the record also supports a finding that Smith Drug's damages were caused in whole or in part by BOM's alleged misrepresentations and omissions. *See Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 636 (Mo. App. E.D. 1980) ("It is sufficient if the assertions were a material factor in Cantrell's decision to invest his money in Superior.") Under the facts of this case, a jury should decide the issue of causation.

For all these reasons, BOM's motion for summary judgment on Count I for fraud is denied.

### C. Count II: Negligent Misrepresentation

In Count II, Smith Drug asserts a negligent misrepresentation claim. This claim has the following elements:

> (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss.

*Renaissance Leasing*, 322 S.W.3d at 134.

BOM argues that summary judgment is warranted on the negligent misrepresentation claim for the same reasons as the fraudulent misrepresentation claim. For the reasons discussed above, BOM's motion for summary judgment on Count II for negligent misrepresentation is denied.

### D. Counts III and IV: Fraud and Conspiracy to Commit Fraud; Aiding and Abetting Fraud

Count III asserts a claim for fraud and conspiracy to commit fraud, and Count IV asserts a claim for aiding and abetting fraud. BOM argues that summary judgment should be entered on Counts III and IV because "Smith Drug cannot point to a single fact which evidences some conspiratorial plan or intent by and between Family Pharmacy and BOM, and indeed the evidence is that there was no such meeting of the minds. Moreover, Smith Drug cannot point to any affirmative action by BOM to carry out fraud[.]" (Doc. #261, p. 53); (Doc. #304, pp. 77-78.)[11]

---

[11] BOM also argues that these claims must be based on an underlying tort and that, because summary judgment is warranted on Counts I and II, summary judgment is also warranted on Counts III and IV. Because BOM is not entitled to summary judgment on Counts I and II, this argument is rejected.

Under Missouri law, the following elements must be established to prevail on a civil conspiracy claim: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged." *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. App. E.D. 2008) (citations and quotations omitted). To prevail on an aiding and abetting claim, "a plaintiff must show that the defendant knew that the other's conduct constitutes a breach of duty and gave substantial assistance or encouragement to the other so to conduct himself." *Aguilar v. PNC Bank*, N.A., 853 F.3d 390, 403 (8th Cir. 2017) (applying Missouri law) (cleaned up).[12] This requires a showing that the "defendant affirmatively acted to aid the primary tortfeasor; neither failure to object to the tortious act nor defendant's mere presence at the commission of the tort is sufficient to charge one with responsibility . . . and mere negative acquiescence is not sufficient." *Id.* (cleaned up).

Upon review, the Court finds that Smith Drug has presented sufficient evidence to show a meeting of the minds and affirmative action. As explained by Smith Drug, the record supports a finding that:

> Bobbett's knowledge that Family needed a lower cost supplier and that the meeting was "extremely important" to Family–combined with Bobbett's false and incomplete statements confirming what Stallion had told Smith earlier – is evidence from which a jury could reasonably infer that Bobbett had a "meeting of the minds" with Stallion to make false statements and partial disclosures to Smith . . . A reasonable jury could also find that BOM provided substantial assistance to Family's perpetration of a fraud on Smith. BOM provided Family substantial assistance by voluntarily attending an "extremely important" meeting with Smith in which BOM confirmed, as Stallion had told Smith, BOM had completed its compliance review, Family complied with the current ratio covenant, and BOM was waiving Family's non-compliance with the loan covenants. The jury can infer that BOM understood that Family's business might well crumble without a successful meeting with Smith. Moreover, following the meeting, BOM gave Family

---

[12] *Aguilar* noted that "the Missouri Supreme Court has yet to decide whether Missouri recognizes a cause of action for aiding and abetting," but assumed the claim was cognizable. *Aguilar*, 853 F.3d at 403 n.15.

additional substantial assistance by not correcting or completing the false and partial disclosures made at the May 9, 2017 meeting.

(Doc. #292, pp. 122-124); *see John Knox Village v. Fortis Constr. Co., LLC*, 449 S.W.3d 68, 78

(Mo. App. W.D. 2014) ("Evidence of a civil conspiracy may be circumstantial.").

For these reasons, the Court denies BOM's motion for summary judgment on Counts III and IV.

## IV. CONCLUSION

Accordingly, Defendant The Bank of Missouri's Motion for Summary Judgment on Each Count of Plaintiff's Third Amended Complaint (Doc. #260) is DENIED. BOM's request for oral argument on the pending motion is denied as unnecessary and as moot.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: May 4, 2021